IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

WESTERN DIVISION

DEBORAH WHEAT                                                    PLAINTIFF

vs.                              CIVIL ACTION NO. 5:21-CV-88-DCB-BWR

THE MICHAELS ORGANIZATION, LLC

AND JOHN DOES 1-10                                             DEFENDANTS

<u>ORDER</u>

BEFORE THE COURT is Defendant The Michaels Organization, LLC's ("Defendant") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 ("Motion") [ECF No. 48]. The Court, having examined the Motion, the submissions of the parties, the record, the applicable legal authority, and being fully informed in the premises, finds as follows:

I.   Factual & Procedural Background

On December 8, 2014, Defendant hired Plaintiff Deborah Wheat ("Plaintiff") as community manager at Riverbreeze Manor Apartments ("Riverbreeze") in Natchez, Mississippi. [ECF No. 49] at 8. Regional Property Manager Takieya Renfro ("Renfro") served as Plaintiff's supervisor. <u>Id.</u> Plaintiff, as community manager, generally oversaw operations and staff at Riverside. <u>Id.</u> In addition to preexisting workplace policies, Defendant issued a

progressive disciplinary policy effective August 1, 2014.[1] Id. at 9.

On August 20, 2019, Defendant hired Michael Good ("Good")[2] as a maintenance technician for Riverbreeze. Id. Good's direct supervisor was Keith Thomas ("Thomas")[3], and Thomas's supervisor was Plaintiff. [ECF No. 49] at 9. Good and Thomas are black males; Renfro is a black female; Plaintiff is a white female. Id.

At first, Good exhibited no workplace performance issues. Id. Beginning in Spring 2020, however, Good's attitude towards his work and his supervisor changed dramatically. Id. Plaintiff submitted workplace incident and counseling reports regarding the following incidents involving Good: (1) On June 15, 2020, Plaintiff submitted a verbal counseling report regarding an incident in which Good turned off the water heater for an apartment unit, failed to report this cutoff, and permitted the water heater to remain off for three days;[4] (2) On June 30, 2020,

---

[1] Although the progressive disciplinary policy called for a verbal report, written report, and probation prior to termination, Plaintiff had twice fired employees, one with advance permission and one that her superiors ratified after-the-fact. [ECF No. 56-1] at 9-11.
[2] When deposed, Good admitted to having between six and seven DUI arrests, an arrest following a bar fight, and to having a hit a woman with whom he once had a relationship. [ECF No. 56-12] at 11-12, 31.
[3] Good testified that Thomas informed him of the job opening at Riverbreeze and encouraged him to apply. [ECF No. 56-12] at 13. Good knew Thomas because "[Good] and [Thomas's] daddy drank and smoked weed together." Id.
[4] The verbal counseling report, which Good refused to sign, included a warning that a failure to follow the corrective action required would result in termination of Good's employment. [ECF No. 48-10].

Plaintiff submitted an incident report that described an altercation in which Plaintiff asked Good about his work the preceding afternoon, and he responded by rushing up so close to her that when he raised his voice moisture from Good's mouth landed on Plaintiff;[5] (3) On July 2, 2020, Plaintiff submitted a written counseling report detailing the events of June 30, 2020[6]; (4) On August 28, 2020, Plaintiff submitted a verbal counseling report in which she wrote that Good closed out a maintenance request without having completed the work requested;[7] (5) On October 13, 2020, Plaintiff submitted a written counseling report in which she noted that Good failed to cooperate or follow procedures and that his behavior was unacceptable.[8]

Plaintiff also reported the following incidents to Renfro via email: (1) On May 26, 2020, Plaintiff emailed Renfro to confirm that she sent Good home for the day because he had been

---

[5] Immediately following this standoff, Plaintiff washed the moisture off her neck and face and "tried not to cry" from the experience that left her "intimated [sic] and frightened." [ECF No. 48-11] at 5. Responding to Plaintiff's incident report, Renfro recommended to the human resources director that Good be placed on administrative leave. Id. at 3. Bob Witkoski, Defendant's human resources director agreed to send Good home for the day and opined that further issues should result in termination. Id. at 2. Renfro's response to Witkoski included that Good requested to transfer to a different property and Renfro took this request under advisement. Id. at 2.

[6] [ECF No. 56-10] at 11. In Plaintiff's July 29, 2020, email, Plaintiff confirmed that Renfro had failed to respond to this written counseling report. [ECF No. 48-12] at 4.

[7] In this report, Plaintiff included that she informed Good that failing to follow the required corrective action will result in termination of his employment. [ECF No. 48-13] at 1.

[8] Again, Plaintiff included in her report the fact that failing to follow the required corrective action will result in termination of his employment. [ECF No. 48-14].

sitting in his truck during his shift;[9] (2) That same email included a narrative of a conversation in which Plaintiff confronted Good about his refusal to answer her five calls to his work radio and he admitted he had turned it off; (3) On July 29, 2020, Plaintiff emailed Renfro a description of a conversation between Plaintiff and Good in which Good admitted to having violated Plaintiff's orders by rearranging the deceased body of a recently-passed former tenant in an apartment unit and permitting the deceased's sister to remove property from the unit;[10] (4) On October 28, 2020, Plaintiff emailed Renfro that Good had bragged to apartment tenants that he "went off on" Plaintiff and that there was nothing she could do about it.[11]

Plaintiff further submitted to the Court evidence of the following incidents: (1) Good had called Plaintiff "an old white witch" on numerous occasions;[12] (2) Plaintiff believed that Renfro failed to reprimand Good because she "didn't care enough

---

[9] Plaintiff clarified in her email that Good's supervisor had not assigned him any work, because he "hadn't seen [Good]." [ECF No. 48-9]. Good had explicit orders to contact his supervisor when he was ready for more work that morning yet failed to do so. Id. at 1.

[10] When Plaintiff asked Good about whether he had followed their mask policy he replied by saying "I don't ever answer you and I'm not going to. I was in charge yesterday and I have already talked to Takieya, so don't worry about it." [ECF No. 48-12] at 7. Renfro directed Plaintiff to correct Good's "nonchalant attitude" by utilizing the progressive disciplinary procedures. Id. at 5.

[11] Renfro informed human resources and Defendant's senior vice president, Chuck Durnin, of Good's statements. [ECF No. 48-15] at 1; [ECF No. 48]19] at 3.

[12] [ECF No. 48-19] at 2.

to do anything" and that she wanted Plaintiff gone because of her skin color;[13] (3) On June 29, 2020, Good refused Plaintiff's directive to put out flyers around the apartment complex, told her to put them up, and then laughingly remarked that she could not because she was too old to work or to walk that far;[14] (4) Good spit on Plaintiff while jumping and yelling at her, asking whether she was scared;[15] (5) Good drove past Plaintiff's house one morning, walked around the property, and claimed to have been dropping off cigarettes for a cousin;[16] (6) Good screamed at Plaintiff when she asked to perform a work task;[17] (7) When Plaintiff questioned Good about one instance of insubordination, he replied with "what you going to do…you just a girl, can't do nothing";[18] (8) Good charged Plaintiff at her desk, she tripped, and he laughed while telling her that she should be scared;[19] (9) Plaintiff eventually placed a can of wasp spray beside her desk chair for defense against a possible attack by Good;[20] (10) When Plaintiff confronted Good about failing to complete a work

---

[13] Id.
[14] Id. at 3; [ECF No. 56-11] at 5. On an email chain following this incident, Human Resources Director Bob Witkoski noted that "[i]f [Good] continues not [sic] to do his work in a non-satisfactory manner or if he refuses to do his work at all, then he should be terminated." [ECF No. 56-2] at 38.
[15] [ECF No. 48-19] at 3-4.
[16] Id. at 3. After this incident, Plaintiff installed cameras on her property, as she claims she was scared. [ECF No. 56-1] at 30, 46-47; [ECF No. 56-12] at 45.
[17] [ECF No. 56-1] at 25.
[18] Id. at 28; [ECF No. 56-11] at 2.
[19] Id.
[20] Id. at 42.

order, he responded that "[e]verybody out here knows you're nothing but an old hag."[21]

Plaintiff also alleges that Renfro empowered Good to disobey her, which essentially sanctioned his harassment of her and subverted her authority as community manager. [ECF No. 48-19] at 3. Plaintiff testified that when she attempted to address work issues with Good, he would tell her to call Renfro and that he had already cleared his conduct with her.[22] [ECF No. 56-1] at 23. Renfro confirmed that Defendant's employment policies place a maintenance tech such as Good under the supervision of a community manager such as Plaintiff. [ECF No. 56-2] at 5-8. Renfro also confirmed that Defendant's employment policies also make a community manager responsible for disciplining and terminating subordinate employees in accordance with company policy.[23] Id.; [ECF No. 56-3].

Plaintiff recorded Good's outbursts and sent them to Renfro, but she claims that Renfro typically failed to respond to her phone calls regarding this harassment. [ECF No. 56-1] at 24. Plaintiff testified that "I had no authority whatsoever,

---

[21] [ECF No. 56-11] at 8.
[22] Plaintiff testified that when addressing another workplace issue with Good that he responded by saying "[Y]ou can't fire, you can't do nothing [sic], call Takieya, she'll tell you, I already talked to her." [ECF No. 56-1] at 25.
[23] Company policy required terminations be reviewed by human resources and approved by the next level manager and appropriate vice president. [ECF No. 56-6] at 4.

there was nothing, [Good] could do whatever he wanted to do, it was like he was the boss, he told me, I wasn't coming out here." Id. at 28. Plaintiff further testified that Good's harassment occurred daily over a 6-month timeframe. [ECF No. 57] at 4.

Defendant ultimately terminated Good on October 30, 2020, following Good's final statement regarding Plaintiff. [ECF No. 48-16] at 6. Defendant's human resources director, Bob Witkoski ("Witkoski"), noted that Good's employment file ultimately included six counseling reports. Id. at 3. Plaintiff's deposition also included that in total she filed six verbal and written reports against Good. [ECF No. 56-1] at 21.

Also on October 30, Plaintiff submitted her own resignation. [ECF No. 48-17]. She cited Good's behavior as the cause of her recent high blood pressure, sleep interruption, anxiety, and stomach issues. Id. In fact, a psychiatric independent medical examination diagnosed Plaintiff with post-traumatic stress disorder arising from her experiences working with Renfro and Good. [ECF No. 56-14]. Plaintiff blamed Defendant for these ailments because of its failure to respond to her repeated reports of abuse by Good. [ECF No. 48-17]. She alleged that Good had yelled and jumped at her, all while Defendant failed to act on her reports regarding Good. Id. Soon after receiving Plaintiff's resignation, Renfro called her to

discuss the reason for her resignation but received no response.
Id.

On January 15, 2021, Plaintiff filed an EEOC Charge of
Discrimination against Defendant on the basis of race, sex, and
age in which she alleged the discrimination occurred from August
2019 until October 30, 2020. [ECF No. 48-18]. Soon after,
Plaintiff was fired from her next job at Village Green Manor
Apartments. [ECF No. 56-1] at 44. Plaintiff alleges that
Defendant, through Renfro, falsified an invoice to make it
appear that Plaintiff had stolen from Defendant and then
contacted her new employer accusing her of being a thief.[24] Id.
at 44-45. Plaintiff alleges that upon termination her new
employer simply told her that Defendant had called her and that
"you know what they said." Id. at 7.

On October 1, 2021, Plaintiff filed suit against Defendants
alleging claims of Title VII race and sex discrimination, Title
VII hostile work environment, and age discrimination under the
Age Discrimination in Employment Act ("ADEA"). [ECF No. 1]. On

---

[24] Renfro emailed Witkoski and Durnin that "[t]he new manager at Riverbreeze
alerted me that the previous manager, Debbie Wheat, ordered items on our
account at Riverbreeze on January 12th. Debbie Wheat has not been employed
with us since October 2020. The new manager will update all records and
ensure we get credit." [ECF No. 56-2] at 56. Durnin responded that "I am
thinking we need to file a police report, unless given this former employee's
current EEOC complaint against us, we think it is not appropriate." Id.; [ECF
No. 56-13].

December 1, 2022, Defendant moved for summary judgment as to these claims. [ECF No. 48].

## II.  Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." Austin v. Kroger Tex., L.P., 864 F.3d 326, 328 (5th Cir. 2017) (internal quotation marks and citation omitted). On summary judgment, all facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings. Deville v. Marcantel, 567 F.3d 156, 163-64 (5th Cir. 2009).

## III. Analysis

In its Motion, Defendant requests that the Court dismiss Plaintiff's claims of race and gender discrimination under Title VII, hostile work environment under Title VII, and age discrimination under ADEA. [ECF No. 48]. The Court will address each claim separately.

1. Title VII Hostile Work Environment

"To establish a claim of hostile work environment, a plaintiff must prove [s]he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on [her] membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." Johnson v. PRIDE Indus., Inc., 7 F.4th 392, 399-400 (5th Cir. 2021). Defendant only disputes the third, fourth, and fifth elements of Plaintiff's claim for hostile work environment. [ECF No. 49] at 13.

a. Harassment Based on Race and Sex

The third element to a Title VII hostile work environment claim is that "the harassment complained of was based on [her] membership in the protected group." Johnson, F.4th at 399-400. When a harasser utilizes verbal, group-based epithets, a fact finder can conclude that other acts of harassment were likewise motivated by that same animus. Id. at 403.

See also Cole v. Bd. of Trustees of N. Ill. Univ., 838 F.3d 888, 896 (7th Cir. 2016) ("[F]orms of harassment that might seem neutral in terms of race ... can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected

status." (citing <u>Landrau-Romero v. Banco Popular de Puerto Rico</u>,
212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not
explicitly racial in nature may, in appropriate circumstances,
be considered along with more overtly discriminatory conduct in
assessing a Title VII harassment claim."))

In this case, Good resorted to verbal harassment in which
he referred to Plaintiff as "an old white witch" and "an old
hag" on multiple occasions. [ECF No. 48-19] at 2; [ECF No. 56-
11] at 8. Good also once threatened Plaintiff by saying "what
you going to do…you just a girl, can't do nothing." [ECF No. 56-
11] at 2. These instances of verbal harassment based on
Plaintiff's status as a white female could easily be taken by a
fact finder as harassment due to her race and gender. As such,
Good's other acts of physical harassment against Plaintiff such
as screaming, jumping, and spitting could also be viewed in
context to be based on Plaintiff's race and gender. <u>Johnson</u>,
F.4th at 403.

Accordingly, Plaintiff has put forth sufficient evidence
that would permit a reasonable jury to conclude that Plaintiff's
status as a white female caused her harassment by Good.

b. Harassment Affected a Term, Condition, or Privilege of
   Employment

11

Harassment affects a "term, condition, or privilege of employment" if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002). Workplace conduct "is not measured in isolation." Id. (quotation marks and citation omitted). To deem a work environment sufficiently hostile, "all of the circumstances must be taken into consideration." Id. This includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quotation marks and citations omitted). To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22.

In this case, Plaintiff alleges, and provides abundant evidence, that Good subjected her to daily episodes of insubordination, routine humiliation, and occasional yet severe bursts of intimidation over approximately six months. See supra pages 2-5. Good's harassment pervaded innumerable interactions with Plaintiff over that time and on occasion drifted into

severe, physical intimidation via Good screaming at, lurching at, and spitting on Plaintiff. Id.

The Fifth Circuit has found harassment to affect a term, condition, or privilege of employment in lesser circumstances. See, e.g., Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 805-806 (5th Cir. 1996) (offensive comments 2-3 times a week was sufficiently severe or pervasive to create a hostile work environment); Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396 (5th Cir. 2013)(Twelve instances of alleged harassment satisfied the "pervasive" requirement); see also Worth v. Tyer, 276 F.3d 249, 268 (7th Cir. 2001) ("[W]e have often recognized that even one act of harassment will suffice [to create a hostile work environment] if it is egregious."); Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1072 (10th Cir. 1998) (holding that a single incident of physically threatening and humiliating conduct can be sufficient to create a hostile work environment for a sexual harassment claim).

Further, Plaintiff's PTSD diagnosis clearly demonstrates that she found Good's behavior offensive. Harris, 510 U.S. at 21-22. Additionally, Plaintiff's proffered evidence could lead a reasonable juror to the same conclusion. Id.

As such, Plaintiff has provided evidence sufficient to
create a genuine issue of material fact that renders summary
judgment inappropriate.

c. Employer Knew of the Harassment and Failed to Take Prompt
   Remedial Action

An "employer has actual knowledge of harassment that is
known to 'higher management' or to someone who has the power to
take action to remedy the problem." Sharp v. City of Houston,
164 F.3d 923, 929 (5th Cir. 1999) (internal citation omitted).
Where a plaintiff has complained to her supervisors regarding
the harassment she has endured, the employer can be found to
have actual knowledge of harassment she has endured. Johnson,
F.4th at 405.

Plaintiff filed numerous internal reports regarding Good's
harassment, emailed her immediate supervisor and Defendant's
human resources department multiple times regarding these
incidents, and repeatedly attempted to call her immediate
supervisor regarding this alleged harassment. See supra pages 2-
5. Therefore, Plaintiff has established a genuine fact issue as
to whether Defendant had actual knowledge of the harassment she
endured. Johnson, F.4th at 405.

The question, then, is whether Defendant failed to take
prompt remedial action in response. Ramsey, 286 F.3d at 268. The

Fifth Circuit "ha[s] held that an employer must take prompt and appropriate remedial action, 'reasonably calculated' to end the harassment" in order to avoid liability. Waltman v. Int'l Paper Co., 875 F.2d 468, 479 (5th Cir. 1989) (quoting Jones v. Flagship Int'l, 793 F.2d 714, 719-20 (5th Cir. 1986). "Whether an employer's response to discriminatory conduct is sufficient will necessarily depend on the particular facts of the case," Williams-Boldware v. Denton Cnty., Tex., 741 F.3d 635, 640 (5th Cir. 2014).

Despite Plaintiff's numerous reports regarding Good's behavior beginning as early as May 2020, his behavior continued seemingly unfettered until his ultimate termination at the end of October. [ECF No. 48-9]; [ECF No. 48-16] at 6. Especially disconcerting is that upon reviewing Plaintiff's report of the June 30, 2020, incident, Witkoski opined that further issues with Good should result in his termination, yet the same sort of issues continued unchecked for four more months until Defendant ultimately terminated Good. [ECF No. 48-11] at 2. As such, a reasonable fact finder could consider all subsequent events of harassment that did not result in termination as evidence that Defendant failed to take remedial action sufficient to end the harassment. Waltman, 875 F.2d at 479.

The Court will not grant summary judgment as to Plaintiff's Title VII hostile work environment claim. Plaintiff has provided evidence sufficient to create fact issues for each disputed element required to form a prima facie case of this claim.

2. Title VII Race & Gender Discrimination

A prima facie case for Title VII discrimination "requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group." McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007).

"Once this prima facie case has been established, there is a presumption of discrimination, and the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the challenged employment action." Pratt v. City of Houston, Tex., 247 F.3d 601, 606 (5th Cir. 2001) (citation omitted).

"[I]f the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine [dispute] of material fact that either (1) the employer's reason is a pretext or (2) that the employer's

reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic[.]" Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 411-12 (5th Cir. 2007) (quotations omitted).

a. Prima Facie Case

Defendant only disputes the third element of Plaintiff's prima facie claim for Title VII race and gender discrimination. [ECF No. 49] at 18. This third element requires that Plaintiff put forth evidence that Defendant subjected her to an adverse employment action. McCoy, 492 F.3d at 556. Defendant never fired Plaintiff: she voluntarily resigned. [ECF No. 49] at 18. Plaintiff, however, claims that Defendant's actions and inactions that permitted harassment and a hostile work environment for approximately six months amount to an actionable constructive discharge.

"A resignation is actionable under Title VII" if it "qualifies as a constructive discharge." Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001). In determining whether an employer's actions constitute a constructive discharge, the Court asks whether "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Penn. State Police v. Suders, 542

U.S. 129, 141 (2004); see McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir.2007) (stating same standard).

Constructive discharge requires that a plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Landgraf v. USI Film Prod., 968 F.2d 427, 430 (5th Cir. 1992), aff'd, 511 U.S. 244 (1994). See also, Pittman v. Hattiesburg Municipal Separate School District, 644 F.2d 1071, 1077 (5th Cir. 1981) (constructive discharge requires "aggravating factors").

The following events are relevant evidence that a reasonable employee would feel compelled to resign:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000) (internal citations omitted). When analyzing evidence of harassment regarding constructive discharge, the Fifth Circuit has held that an employer's "invidious intent to create or perpetuate the intolerable conditions compelling resignation" operates as an aggravating factor warranting a finding of

18

constructive discharge. Haley v. All. Compressor LLC, 391 F.3d 644, 650 (5th Cir. 2004). Additionally, the Fifth Circuit examines whether an employee attempted to resolve the allegedly intolerable conditions prior to resigning. Id. at 652.

Plaintiff submitted testimonial evidence that is a near-perfect match to the aggravating factor found in Haley. Id. at 650. Plaintiff's testimony reads in relevant part that "[Renfro] has given [Good] permission to do whatever he wants to do so that maybe I'll quit..." [ECF No. 56-1] at 27. See also, "[Goods' harassment] progressed just because…[Renfro] would not back me up…like she wanted me gone." Id. at 49. Good's repeated phone calls to Renfro to circumvent the chain of command to bypass Plaintiff's authority over him lend credence to Plaintiff's testimony. [ECF No. 56-1] at 25, 31, 36; [ECF No. 56-2] at 23, 29, 36-37; [ECF No. 56-12] at 12, 13, 25, 28, 31, 34, 48.

Additionally, assuming Plaintiff's testimony to be true, as we must on summary judgment, it could lead a reasonable fact finder to conclude that by Renfro enabling Good to continue on with his harassment that Defendant "perpetuate[d] the intolerable conditions compelling [Plaintiff's] resignation." Haley, 391 F.3d at 650; Davis v. Fernandez, 798 F.3d 290, 296 (5th Cir. 2015). As such, Plaintiff has submitted evidence that

19

renders summary judgment of this claim inappropriate at this stage of the three-part McDonnell Douglas analysis.

    b. Legitimate, Nondiscriminatory Reason

    The burden now shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the harassment that gave rise to Plaintiff's constructive discharge. Terry v. Quitman Cnty. Sch. Dist., No. 3:16-CV-00013-DMB-RP, 2017 WL 2426873, at *7 (N.D. Miss. June 5, 2017). "To meet its burden, [Defendant] must clearly set forth, through the introduction of admissible evidence, the reasons for [the constructive discharge]." Vaughn v. Woodforest Bank, 665 F.3d 632, 636 (5th Cir. 2011) (quotations omitted). "At this stage of the burden-shifting framework, credibility determinations are not appropriate." Prejean v. Radiology Assocs. of Sw. Louisiana Inc., 342 F. App'x 946, 950 (5th Cir. 2009)(citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

    Defendant argues both that (1) Plaintiff never suffered an adverse employment action and (2) that Defendant merely followed its own progressive disciple policies and ultimately terminated Good. [ECF No. 49] at 19-20. The Court, having determined that a reasonable fact finder could find that Plaintiff was constructively discharged, need only address Defendant's second argument.

The courts generally accept this when an employer follows its employee discipline policy as a legitimate, nondiscriminatory explanation. See generally, Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 659 (5th Cir. 2012); Dittmar v. 3M Co., No. 6:21-CV-043-H, 2022 WL 17858071, at *7 (N.D. Tex. Dec. 22, 2022); Snyder v. L-3 Commc'ns Vertex Aerospace, LLC, No. 1:19-CV-034-SA-DAS, 2020 WL 869977, at *6 (N.D. Miss. Feb. 21, 2020).

Taken as true, this reason supports a finding that Defendant was not motivated by race- or gender-based animus in following its progressive discipline policy. Hicks, 509 U.S. at 509.

c. Pretext

At this stage, Plaintiff must show by circumstantial evidence that Defendant's "proffered reason[s][are] simply a pretext for discrimination." Manning v. Chevron Chem. Co., 332 F.3d 874, 881 (5th Cir. 2003). "[S]ummary judgment is inappropriate if the evidence taken as a whole ... creates a reasonable inference that [race and gender were] determinative factor[s] in the actions of which plaintiff complains." Pratt v. City of Houston, 247 F.3d 601, 606–07 (5th Cir. 2001) (quotation marks omitted).

Courts often find pretext when an employer departs from its employment policies. See Richardson v. Monitronics Int'l, Inc., 434 F.3d 327, 336 (5th Cir. 2005) ("[a]n employer's failure to follow its own policies may be probative of discriminatory intent ...."); Owens v. Circassia Pharms., Inc., 33 F.4th 814, 828-29 (5th Cir. 2022) ("An employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the 'defendant's explanation ... unworthy of credence' and permits an inference of discrimination.") See also, Goudeau v. Nat'l Oilwell Varco, L.P., 793 F.3d 470, 477 (5th Cir. 2015); Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir.2005); Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen., 730 F.3d 450, 454-55 (5th Cir. 2013).

Defendant's proffered legitimate, nondiscriminatory reason for allegedly permitting Good's harassment is that it followed its harassment and progressive discipline policy before ultimately firing Good on October 30, 2020. [ECF No. 48-16] at 6. Defendant's non-harassment policy prohibits harassment and emphatically warrants that "[e]very report of perceived harassment will be fully investigated and corrective action will be taken where appropriate." [ECF No. 56-7].

Witkoski noted on June 30, 2020, that further proscribed behavior by Good should result in his termination. [ECF No. 48-11] at 2. Defendant's failure to terminate Good for four more months despite multiple intervening acts and reports of harassment by Good could permit a reasonable fact finder to believe that Defendant departed from its employment policies. Richardson, 434 F.3d at 336; See supra pages 2-5.

At this stage in its McDonnell Douglas analysis, the Court concludes that the Plaintiff has submitted evidence of this claim that creates genuine issues of material facts and pretermits summary judgment.

3. ADEA Age Discrimination

Under the ADEA, "[i]t shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Age discrimination can be shown using the same McDonnell Douglas burden-shifting framework found in Title VII race and gender discrimination cases. Rachid v. Jack In The Box, Inc., 376 F.3d 305, 309 (5th Cir. 2004).

a. Prima Facie Case

23

To demonstrate age discrimination a "plaintiff must show that '(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age.'" Rachid, 376 F.3d at 309.

Defendant admits that Plaintiff satisfies the final three elements. [ECF No. 49] at 21. The Court, however, has already determined that a fact issue exists as to constructive discharge. See supra pages 15-19. As such, Plaintiff can move past the prima facie stage of defending an age discrimination claim on summary judgment.

b. Legitimate, Nondiscriminatory Reason & Pretext

Defendant provides no legitimate, nondiscriminatory reasons as it relates to Plaintiff's age discrimination claim and instead relies on its argument that it did not constructively discharge Plaintiff. [ECF No. 49] at 20-21. Having failed to meet its burden, the Court could end its inquiry here and deny summary judgment as to this claim. Rachid, 376 F.3d at 309.

Assuming, arguendo, that Defendant intended to rely on the same reasons above, operatively that it merely followed its employment policies, the Court again finds that a reasonable

24

fact finder could find pretext based on Defendant's departure from its harassment and progressive discipline policies by not terminating Good earlier than it otherwise did. As such, the Court will not dismiss Plaintiff's claim for age discrimination at stage of litigation.

IV.  Conclusion

Plaintiff has supplied evidence as to each claim of her complaint such that summary judgment is an imprudent means to dispose of this case.

For the foregoing reasons, the Defendants' Motion [ECF No. 48] shall be DENIED.

ACCORDINGLY,

IT IS HEREBY ORDERED that the Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 [ECF No. 48] is DENIED.

SO ORDERED, this 7th day of March, 2023.

/s/ David Bramlette
DAVID C. BRAMLETTE
UNITED STATES DISTRICT JUDGE